UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CRYSTAL DAVIS,

                Plaintiff,           Case Number 14-12664

v.                                    Honorable David M. Lawson

STACI KENDRICK, and
AMANI MARION,

                Defendants.

_____/

**OPINION AND ORDER DENYING MOTION FOR SUMMARY JUDGMENT
AND EXTENDING DATE FOR SUBMISSION OF
PROPOSED JOINT FINAL PRETRIAL ORDER**

In April 2014, plaintiff Crystal Davis had sole legal and physical custody of her 15-year-old daughter, D.M.  Sometime that month, however, the child's father, David Mack (who was not married to Davis), was allowed to pick her up from school, and he refused to return her to Davis. Michigan's Child Protective Services agency got involved, but, according to the plaintiff, the assigned case workers, defendants Staci Kendrick and Amani Marion, sided with Mack and interfered with D.M.'s return to Davis.  D.M. eventually was returned to her mother two months later, but not until Davis filed a complaint with the police charging Mack with parental kidnaping. Davis filed the present action against Kendrick and Marion alleging violations of procedural and substantive due process and conspiracy.  The defendants filed a motion for summary judgment arguing that no constitutional violation occurred and they are entitled to qualified immunity.  The Court heard oral argument on September 30, 2015.  Because Davis has shown that Kendrick and Marion attempted to place the physical custody of D.M. with Mack, despite a contrary court order and against Davis's wishes, she has shown that the defendants committed constitutional violations. Kendrick and Marion dispute those facts, but because they must accept them when presenting their

motion for summary judgment, and those facts viewed from the plaintiff's perspective show that Davis's right to custody of her daughter was clearly established, Kendrick and Marion cannot claim qualified immunity. The motion for summary judgment, therefore, will be denied.

I.

In April 2014, Davis's daughter D.M., who was then 15 years old, was attending the Communications and Media Arts High School (CMA) in Detroit, Michigan. Davis had been awarded "sole legal and physical custody" of D.M. by order of the Wayne County, Michigan circuit court back on February 26, 2008. Until mid-April 2014, Davis's four children, including D.M., all lived with Davis at her home. David Mack is the father of Davis's four children, but Mack and Davis never married. Mack had spent some time in prison, but after he was last released in June 2012, Davis allowed her children to visit with Mack, sometimes spending as long as a weekend with him at his home. However, by April 16, 2014, Davis was no longer allowing her daughters to have visitation with Mack, because in early April Mack had "come to [her] house with guns."

In 2014, Donya Odom, a former defendant in this case, was the principal at the CMA school. Before April 2014, when Davis enrolled her daughter at the CMA school, Davis said that she "informed [Odom] that [she] had sole physical and legal custody," of her daughter, and that "no one outside of who [Davis authorized] is able to pick [D.M.] up."

In mid-April 2014, D.M. called her father from school and asked him to come pick her up. D.M. told her father that she wanted to live with him, because she "wanted to bond with him again and [] didn't [] like the rules that [her] mom was giving out at home and [she] recently got physically disciplined and [] felt like [she] was too old to be getting a whupping [sic]." Mack told D.M. that he and his daughter would have to talk to principal Odom about him picking her up first. On April

-2-

15, 2014, the day after his daughter called him, Mack went to the school, and he had a meeting with principal Odom and D.M.  D.M. told Odom that she wanted to live with her father because she wanted to bond with him, did not like her mother's rules, and her mother recently had hit her with a belt to physically discipline her.  Davis admits that "a couple of weeks prior" to the middle of April 2014, she had "give[n] [D.M.] a couple of licks on her bottom" to discipline her daughter for skipping school.  Odom asked D.M. to pull up her shirt to show her back to see if there were any bruises, but Odom observed that there were no marks.  Odom told D.M. that she was making serious allegations, and, if she wanted to pursue a complaint of abuse, then Odom would need to contact Child Protective Services.  Odom told D.M. that she should take a day to "mull it over," and that Odom would speak to D.M. again the next day about the abuse allegations and D.M.'s desire to live with her father.

Odom contends that she never authorized D.M. to go home with her father and expressly told D.M. and Mack that D.M. would not be released to him.  However, D.M. testified that Odom "told [Mack] that he could come and get me after the pancake breakfast was over [on April 16, 2014]."  D.M. stayed at school through the "fifth hour" class period, and then "Ms. Odom told [her that she] could call [her] dad to leave."  D.M. went to the school office, and she used an office phone to call Mr. Mack.  Odom was present and told office staff to let D.M. use the phone at the front desk to call her father.  When Mack arrived, Odom told him to go with D.M. so Mack could sign her out in the counselor's office.  Nobody was in that office, so the two returned to the front desk, and an office administrator told D.M. that they could sign out at the front desk, which they did.  Davis never was notified that Mack picked up her daughter from school on April 16th.  Wayne County Assistant Prosecutor Mary Rubio testified that, during a phone call that Rubio placed to Odom, Odom told

Rubio that she had released D.M. from school on April 16, 2014 to go home with her father because defendant Kendrick had told Odom that the plaintiff's parental rights were terminated.

The day after Mack took his daughter home from school, he asked Odom if she had contacted Child Protective Services, and Odom told Mack she had not. Mack then contacted CPS, and "told them [D.M.] had [made] allegations that her mother was beating her and the second oldest [child]." Defendant Staci Kendrick was assigned to the case, and she came out to Mack's house to speak with Mack and his daughter a few days later. Kendrick met with Mack several more times in the following weeks, and she told Mack that Davis wanted D.M. to come back home. During the investigation, Davis provided Kendrick with contact information for family members who could attest to the nature of her parenting of D.M., but Kendrick never contacted any of them. When Davis asked Kendrick later why she never contacted any of Davis's family to speak to them about the allegations of abuse, Kendrick told Davis that "she [didn't] believe there was abuse so she really didn't have to contact the people" that Davis had suggested to her as references. During Kendrick's investigation, Davis also showed Kendrick the court order awarding her full physical and legal custody of D.M., and Kendrick never took any legal action to seek a modification of that order. Kendrick told Davis that she understood the situation, "didn't believe the allegations that [were] being made," and "[was] working with [Davis]" to get D.M. back to her mother.

D.M. stayed with her father and did not speak to her mother through the remainder of April and early May, until a "family team meeting" that was arranged by Child Protective Services on May 6, 2014. Present at the family meeting were D.M., her father and mother, her sisters, D.M.'s stepmother (Mack's wife), and stepfather (Davis's husband), and defendants Staci Kendrick and Amani Marion, from Child Protective Services.

-4-

Before the family meeting, D.M. had a separate meeting with Kendrick and Marion, during which Kendrick told D.M. that Kendrick would "help [D.M.] be able to live with [her] daddy," but that D.M. would have to do "certain things [] to help [Kendrick]."  According to D.M., Kendrick told D.M. that D.M. would "have to use different terms when [she] talked to [Kendrick] or when [she] talke[ed] in front of other people, like the B word and stuff like that."  D.M. testified that "[Kendrick told me that I] had to say that my mom beat me in order for [Kendrick] to actually pull me, I forgot what she [said], a file on my case or something like that."  D.M. observed that during the discussion Kendrick, Marion, and a third, unidentified woman discussed the subject of who should have "custody" of D.M., that "they [were] coming to agreement about it," and that "[t]hey were just basically saying I was going to go home with my daddy."

David Mack testified that, during the May 6 meeting with Child Protective Services workers and all of the family members, "nothing was accomplished," and soon a heated argument erupted between Mack, Ms. Davis, and Ms. Davis's husband (D.M.'s stepfather).  Davis testified that, before the family team meeting, Kendrick had told Davis that Davis would be getting her daughter back at the meeting.  But during the meeting, Kendrick told Davis that "[Mack] had custody," and that "[c]ustody was taken from [her], removed from [her] and given to him."  Defendant Amani Marion, who was Kendrick's supervisor and oversaw Kendrick's handling of the meeting, "agreed with Ms. Kendrick" that Mr. Mack "had custody . . . and [her] daughter was not going home with [Davis]."  Davis wanted D.M. to go home with her, but after the argument erupted, the CPS workers called a halt to the meeting and had "security come and escort Miss Davis, her husband, and the children [other than D.M.] out."  D.M. then left the meeting with her father.

Davis testified that she "never agreed to any safety plan" during the family meeting, and instead insisted to both Kendrick and Marion that she wanted D.M. to come home with her.  Marion, however, told Davis that "sometimes we have to do things against [the] parents' [desires]," and that CPS would "like the parents to agree but even if the parents don't agree [CPS has to] make the best decision [that they] think [is] in the child's best interest."

On May 15, 2014, Davis went to the Detroit Police Department and made a complaint that Mack had kidnapped her daughter.  Lieutenant Jeffrey Hahn took statements from Davis and her husband, and he spoke to Kendrick on the phone while Davis was at the police station.   Kendrick told Hahn that she would send him some paperwork showing that Mack had custody of D.M.  Hahn believed that Kendrick was "trying to influence [him] to release [D.M.] to Mack."  Hahn understood Kendrick to represent that there was a CPS case open regarding D.M.'s situation, and he testified that he expected to receive "something a little bit more official" than what Kendrick eventually provided to substantiate Kendrick's statements to him.   Kendrick eventually sent an email with an attached letter signed by Kendrick and Marion which stated as follows:

> This letter is to inform you that on 04/16/2014, Children's Protective Services (CPS) received a complaint alleging child abuse and/or neglect.  A [Family Team Meeting] was held on 05/05/2014 at North Central DHS with the family.  The family has agreed to a safety plan with the father, David Mack, pending the CPS investigation.  The family was also advised to contact [Friend of the Court] regarding parenting time and custody issues.  Both Crystal [Davis] (mother) and David Mack agreed to this safety plan.  If you have any questions or concern[s] contact me.

Plf.'s Resp., Ex. K, Letter dated May 15, 2014.  In the meantime, D.M. had called her father from school and told him that a Fox 2 news crew had come to the school and wanted to interview her about allegations that her father had kidnaped her.  Mack then went to the school and met with Odom in the principal's office.  Odom called the police detective that was in charge of the kidnaping

-6-

case, and the detective told Mack to come down to the precinct with D.M. so that the police could investigate the situation.  While Hahn was taking statements from Davis and her husband, Mack and D.M. arrived.   After taking statements from Mack and D.M., and after reviewing all of the statements and the letter from Kendrick and consulting with prosecutors, Hahn determined that Davis had sole legal custody of D.M., and he decided that D.M. would go home with her mother, which she then did.

On June 18, 2014, David Mack was charged by the Wayne County, Michigan prosecutor's office with parental kidnaping and custodial interference under Michigan Compiled Laws § 750.350a(1).

The plaintiff filed her complaint in this Court on July 8, 2014, raising three claims against the defendants via 42 U.S.C. § 1983, alleging that they violated her procedural and substantive due process rights (counts I and II), and that they conspired to commit those violations (count III). Discovery closed on April 15, 2015, and the defendants timely filed their motion for summary judgment.  The parties later stipulated to dismiss all claims against defendants Donya Odom and Traci Lee Brown.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Sixth Circuit has explained:

> Both claimants and parties defending against a claim may move for summary judgment "with or without supporting affidavits." Fed. R. Civ. P. 56(a), (b). Such a motion presumes the absence of a genuine issue of material fact for trial. The court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

-7-

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

*Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." 576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "Thus, the mere existence of a scintilla of evidence in support of the [opposing party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." 350 F.3d at 546 (quoting 477 U.S. at 252) (quotations omitted).

-8-

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

In a defensive motion for summary judgment, the party who bears the burden of proof must present a jury question as to each element of the claim. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Failure to prove an essential element of a claim renders all other facts immaterial for summary judgment purposes. *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc.*, 936 F.2d 889, 895 (6th Cir. 1991).

Defendants Kendrick and Marion insist that the real culprit in the custody dispute over D.M. was David Mack, and they did nothing to interfere with Davis's physical or legal custody of her daughter. With a gloss on the record facts that tilts in their favor, Kendrick and Marion argue that they merely stood by and monitored the dispute. They say that they obtained agreement from Mack and Davis for the "safety plan" at the May 6, 2014 family team meeting merely to "maintain the status quo." And they contend that their failure to be aggressive in helping Davis secure the return of her daughter did not rise to the level of deliberate indifference, because they did not seek a legal change of legal custody or actually remove D.M. from Davis's physical custody. Finally, they argue that there is no evidence to show that Kendrick and Marion formed any conspiratorial agreement, because the decision to impose the safety plan was made on the spot, when the family

team meeting erupted into conflict, and the fact that Marion and Kendrick, under the circumstances at hand, merely concurred in the recommendation to institute a safety plan is insufficient as a matter of law to show that they made or carried out any unlawful plan to violate Davis's rights.

### A. Constitutional violations

The plaintiff has brought all of her claims under the enabling provisions of 42 U.S.C. § 1983. "Section 1983 of Title 42 of the United States Code imposes civil liability on those individuals who, acting under color of state law, deprive a citizen of, among other things, his federally guaranteed constitutional rights." *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Brosseau v. Haugen*, 543 U.S. 194, 197-98 (2004)). "To state a claim under § 1983, a plaintiff must set forth facts that, when favorably construed, establish: (1) the deprivation of a right secured by the Constitution or laws of the United States; (2) caused by a person acting under the color of state law." *Ibid.* (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).

### 1. Substantive due process

The plaintiff alleges that the two CPS workers made false and exaggerated claims of abuse, engaged in duplicitous deal-making with D.M., Mack, and Davis, and lied to public officials in their efforts to effectuate a custody change in favor of Mack and against the wishes of Davis and contrary to a state custody order. Davis argues that the defendants' conduct was arbitrary and conscience-shocking, amounting to a violation of her substantive due process rights.

"Substantive due process is '[t]he doctrine that governmental deprivations of life, liberty or property are subject to limitations regardless of the adequacy of the procedures employed.'" *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014) (quoting *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1216 (6th Cir. 1992)). "It protects a narrow class of interests, including those enumerated in

-10-

the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that 'shock the conscience.'" *Ibid.* (quoting *Bell v. Ohio State Univ.*, 351 F.3d 240, 249-50 (6th Cir. 2003)). "It also protects the right to be free from 'arbitrary and capricious' governmental actions, which is another formulation of the right to be free from conscience-shocking actions." *Ibid.* (citing *Bowers v. City of Flint*, 325 F.3d 758, 763 (6th Cir. 2003); *Pearson*, 961 F.2d at 1216-17).

In *Range*, the Sixth Circuit discussed the difficulty of deciding when wrongful governmental behavior crosses the conscience-shocking line into the territory of constitutional violations. The "easier cases," the court noted, fall on the extreme ends of a continuum: "[n]egligent tortious conduct" does not qualify, while actions "'intended to injure' without any justifiable government interest" certainly do. *Range*, 763 F.3d at 590. "Conduct that is more akin to recklessness or gross recklessness, such as deliberate indifference, is a matter for closer calls." *Ibid.* (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). The court suggested factors

> that bear on the question of whether deliberate indifference amounts to conscience-shocking behavior: (1) the voluntariness of the plaintiff's relationship with the government, (2) whether there was time for the government actor to deliberate, and (3) whether the government actor was pursuing a legitimate governmental purpose. A critical question in deliberate indifference cases is whether the circumstances allowed the state actors time to fully consider the potential consequences of their conduct.

*Ibid.*

As an initial matter, the defendants argue that one item of evidence — the testimony by assistant prosecutor Mary Rubio that Odom told Rubio that she had released D.M. from school to go home with her father because Kendrick had told Odom that the plaintiff's parental rights were terminated — cannot be considered because it is inadmissible hearsay. The defendants are correct.

-11-

Rubio's testimony about what Odom told her would be offered to prove the substance of Odom's rendition of what Kendrick told her: that Kendrick said to Odom that Davis's parental rights were terminated.  Although Kendrick's alleged statement to Odom — offered by the plaintiff — would not be hearsay because Kendrick is a party — *see* Fed. R.. Evid. 801(d)(2)(A); *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000) — Odom's statement to Rubio would fit the hearsay definition. *See* Fed. R. Evid. 801(c).

In context, Rubio's conversation with Odom was to obtain an explanation for why Odom released D.M. to her father.  And Federal Rule of Evidence 803(3) provides an exception to the hearsay rule for a "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) . . . ."  As the Sixth Circuit explained recently, "Rule 803(3) allows witnesses to recount hearsay statements (that is, statements offered to prove the truth of the statements' factual content) when the statement's original declarant is expressing his or her then-existing state of mind." *United States v. Kilpatrick*, 798 F.3d 365, 386 (6th Cir. 2015).  However, federal courts uniformly have limited such testimony where it goes beyond merely relating the declarant's state of mind and concerns the underlying reasons for that state of mind, particularly where the explanation of the reasons would include the declarant's account of a defendant's conduct, and especially where evidence of that conduct directly implicates the defendant's liability.  *Daniels v. Lafler*, 192 F. App'x 408, 424-25 (6th Cir. 2006) (collecting cases).  Here, there is a dispute over whether Kendrick made the statement to Odom; Kendrick denies it and Odom does not confirm it.  Rubio's testimony would be offered to prove that Kendrick made the statement, not merely to show Odom's state of mind.  Rule 803(3) does not furnish an exception under the circumstances, and the hearsay rule would bar Rubio's testimony.  Fed. R. Evid. 802.

-12-

The evidence that a party presents to avoid summary judgment eventually must be able to find its way into a trial record. *Alexander*, 576 F.3d at 558 (observing that "the party opposing summary judgment must show that she can make good on the promise of the pleadings by laying out enough evidence that will be admissible at trial to demonstrate that a genuine issue on a material fact exists"). Evidence that "cannot be presented in a form that would be admissible in evidence" at trial is objectionable. Fed. R. Riv. P. 56(c)(2). Because Rubio's proffered testimony could not be placed into any form that would be admissible at trial, it must be excluded from consideration at the summary judgment stage.

Even without Rubio's testimony, however, the plaintiff has submitted sufficient evidence for a jury to conclude that defendants Kendrick and Marion unlawfully interfered with Davis's protected liberty interest in the physical and legal custody of her daughter, and that their conduct in doing so was sufficiently extreme to be "conscience shocking." The record before the Court would allow a jury to find all of the following facts. *First*, Kendrick repeatedly told Davis during the course of Kendrick's investigation that she did not believe the allegations of abuse, and that she was "working with" Davis to help the plaintiff get her daughter back. To explain why she never contacted any of the family members whom Davis suggested to verify the nature of Davis's parenting, Kendrick reiterated her belief that Davis had not abused her daughter. *Second*, Kendrick lied to Davis and told her that the purpose of the May 6, 2014 "family team meeting" was to return Davis's daughter to her custody. *Third*, despite this avowed purpose, before the meeting Kendrick and Marion had a separate conference alone with D.M., in which Kendrick and Marion came to an agreement that D.M. would go home with her father. Moreover, during that private conference, Kendrick coached D.M. to dramatize her statements and say that Davis "beat her," in order to justify Kendrick's and

-13-

Marion's intervention and to ensure that D.M. could be placed with her father, despite the fact that Kendrick did not believe that Davis had abused her daughter. *Fourth*, Kendrick told Davis during the family meeting that custody of D.M. had been removed from her and given to David Mack, despite the fact that Davis previously had shown Kendrick the family court order awarding Davis sole legal and physical custody. It appears undisputed that neither Kendrick nor Marion ever pursued any petition or other formal legal process to modify that order of custody. *Fifth*, Kendrick and Marion told Davis at the meeting that they had determined that D.M. would leave with her father whether or not Davis agreed with that decision. *Sixth*, when Davis objected to the denial of her custody, Kendrick and Marion summoned security guards to compel Davis to leave without her daughter, and to ensure that D.M. left with her father.

Davis's custody of D.M. was not restored until May 15, 2014, when Detroit Police Lieutenant Hahn intervened and ordered that D.M. be returned to her mother. Kendrick's and Marion's abuse of their power and the authority of the Child Protective Services agency in lying to Davis, coaching D.M. to make false allegations of abuse, falsely telling Davis that her lawful custody of D.M. was terminated, and summoning security guards to enforce their predetermined plan, certainly rises to the level of "conduct on the [] extreme end of the culpability spectrum," "which [was] 'intended to injure' without any justifiable government interest," and it therefore "clearly rises to the 'conscience-shocking' level." *Range*, 763 F.3d at 90.

The defendants argue that they acted reasonably, or at most only negligently and not deliberately indifferently to Davis's rights, when they instituted the "safety plan" that called for D.M. to remain with her father, in order to defuse the heated situation at the family meeting. But a jury readily could conclude that Kendrick and Marion themselves provoked the discord between

the families, by lying to Davis and telling her that she would get her daughter back at the family meeting, and then revealing only during the meeting that they had no intention of allowing Davis to take her daughter home, and that their decision would be imposed whether Davis agreed or not. If true, the defendants' shocking and deliberate conduct cannot be excused by a concocted "crisis" of their own making. *DiLuzio v. Vill. of Yorkville, Ohio*, 796 F.3d 604, 614 (6th Cir. 2015) ("[O]fficials cannot deny citizens due process by falsely invoking an emergency need for quick action."). Moreover, because the defendants' premeditated and outrageous conduct (as the facts viewed in the light most favorable to the plaintiff demonstrate) was deliberately intended to injure Davis's custody rights and unjustified by any legitimate government interest, the deliberate indifference standard need not be invoked. *Range*, 763 F.3d at 90.

### 2. Procedural due process

In order to establish a procedural due process violation, the plaintiff must show that she (1) had a life, liberty, or property interest protected by the Constitution; (2) was deprived of that interest by a state actor; and (3) was not afforded timely and adequate process under law. *Waeschle v. Dragovic*, 576 F.3d 539, 544 (6th Cir. 2009). "The right to procedural due process requires that when a state seeks to terminate a protected interest it must afford notice and opportunity for hearing appropriate to the nature of the case." *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 296 (6th Cir. 2006) (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972)) (quotations omitted). The Sixth Circuit has explained that "the fundamental requirement of procedural due process is that an individual be given an opportunity to be heard at a meaningful time and in a meaningful manner." *Morrison v. Warren*, 375 F.3d 468, 475 (6th Cir. 2004) (citing *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

The plaintiff has submitted sufficient evidence upon which a jury reasonably could conclude that Kendrick and Marion violated Davis's procedural due process rights by denying her any meaningful opportunity to be heard before unlawfully obstructing the plaintiff's custody of her daughter. Once again, the plaintiff-favorable view of the record shows that Davis was not afforded "an opportunity to be heard at a meaningful time and in a meaningful manner." *Morrison*, 375 F.3d at 475(citing *Mathews*, 424 U.S. at 335). Kendrick does not appear to have given any reasonable consideration to the information that Davis gave her during the investigation, and she justified that disregard based on her determination that Davis had not, in fact, abused her daughter. But despite that determination, before hearing anything that Davis had to say, Kendrick and Marion discussed D.M.'s situation between themselves, while alone with D.M., came to their own private agreement that D.M. would go home with her father from the family meeting, and then coached D.M. on how to phrase dramatized and false allegations that Davis "beat" her, in order to justify that decision. A jury could conclude that Kendrick and Marion based their decision on nothing more than D.M.'s stated desire to live with her father, notwithstanding the custody order of which both were aware, and that they did not afford Davis any reasonable opportunity to be heard before enforcing that predetermined decision.

The defendants rely on the Sixth Circuit's decision in *Smith v. Williams-Ash*, 520 F.3d 596 (6th Cir. 2008), for the proposition that the court of appeals has "rejected the argument that the inherently coercive nature of safety plans (voluntary agreement in place of petition for removal) violates the due process clause." Def.'s Mot. for Summ. J. at 17. *Smith* is distinguishable because there the Sixth Circuit held merely that "the [plaintiff parents] were not entitled to a hearing because

-16-

they *consented* to the removal of their children pursuant to a voluntary 'safety plan.'"  520 F.3d at

597-98 (emphasis added).  As the court of appeals explained:

> In this case, the Smiths remained in the safety plan voluntarily at all times.  Although
> our dissenting colleague questions whether the Smiths were coerced into the plan,
> not even the Smiths argue that they involuntarily consented to enter into the plan.
> Rather, they only argue that they "were not allowed to recover their children after the
> Safety Plan had been initiated despite their best efforts," invoking the principle
> announced in *Farley v. Farley* that the consent given as part of a voluntary safety
> plan may become involuntary during the course of the plan.  225 F.3d 658 (6th Cir.
> July 19, 2000).  But here, in light of the Smiths' admitted failure to utilize the safety
> plan's clear, simple mechanism for rescinding the plan, they fail to raise a genuine
> issue of material fact with respect to their continuing consent to the plan.

*Id.* at 600 (citations omitted).  In this case, the plaintiff testified — and she adamantly maintains —

that she never consented to the imposition of a safety plan requiring her daughter to be placed with

Mr. Mack instead of going home with Davis.  That fact must be accepted as true for this summary

judgment motion, the defendants' arguments to the contrary notwithstanding.

### 3.   Conspiracy

"A civil conspiracy under § 1983 is an agreement between two or more persons to injure

another by unlawful action."  *Webb v. United States*, 789 F.3d 647, 670 (6th Cir. 2015) (citing *Bazzi*

*v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011); *Revis v. Meldrum*, 489 F.3d 273, 290 (6th

Cir. 2007)) (quotations and alterations omitted).  "A plaintiff must show that (1) a 'single plan'

existed; (2) defendants 'shared in the general conspiratorial objective' to deprive the plaintiff of his

constitutional rights, and (3) 'an overt act was committed in furtherance of the conspiracy that

caused [the plaintiff's] injury.'"  *Ibid.* (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)).

"[A] plaintiff may, and often must, prove a conspiracy through circumstantial evidence."  *DiLuzio*,

796 F.3d at 613.

-17-

The plaintiff has submitted sufficient evidence from which a jury reasonably could conclude that Kendrick and Marion conspired to violate her due process rights and acted overtly in furtherance of that conspiratorial objective.  The jury reasonably could find, based on testimony by D.M., Davis, and Mack, that, during the private meeting with D.M. on May 6, 2014, Kendrick and Marion agreed to interfere unlawfully with Davis's custody of her daughter, despite the fact that neither believed there was any justification for such interference.  Kendrick and Marion then acted overtly in furtherance of their conspiratorial objective when they summarily informed Davis that custody of D.M. had been removed from her and awarded to Mack, despite the fact that they had not pursued any legal process to modify the custody order.  They further advanced the conspiracy when they summoned security guards to enforce their decision and remove Davis from the building, ensuring that she could not go home with her daughter.  Davis testified that Marion and Kendrick agreed jointly to enforce that decision during the family meeting.  Moreover, not content with the accomplished frustration of Davis's custody rights, Kendrick and Marion acted again to prolong the alienation of D.M. from her mother when, on May 15, 2014, Kendrick tried to "influence" Lieutenant Hahn to release D.M. to her father, including by sending a letter to Hahn, bearing the signatures of both Kendrick and Marion, falsely stating that Davis had agreed to the purported "safety plan" awarding custody of D.M. to Mack.

The defendants contend that the conspiracy claim is barred by the doctrine of intracorporate conspiracy, under which it is held that individuals who are employees of a single governmental entity cannot, as a matter of law, conspire with one another.  In a recent published decision, the Sixth Circuit held that the doctrine is inapplicable where the record shows that the individuals in question acted intentionally to procure a deliberate and unlawful denial of the plaintiff's rights.  *DiLuzio*, 796

-18-

F.3d at 616 ("[E]ven if the intracorporate conspiracy doctrine applies to municipal government officials in a § 1983 action (and we do not here hold that it necessarily does), the doctrine does not apply in this case because the defendants are accused of conspiring to wrongfully divest DiLuzio of his property, which would fall outside the scope of their employment.  These defendants cannot invoke this defense.").  The same reasoning applies here; the intracorporate conspiracy doctrine does not bar the conspiracy claim in this case.

### B.  Qualified immunity

The defendants argue that even if the plaintiff has established a constitutional violation, they are entitled to qualified immunity, because none of the violations were clear.  They maintain that their failure to return D.M. to Davis's custody at the May 6, 2014 family team meeting could not rise to the level of deliberate indifference, because their recommendation of the "safety plan" (which they assert Davis agreed to), was simply an attempt to defuse the heated family conflict that erupted at the meeting, which gave them a reasonable basis to be concerned for D.M.'s safety.

It is true that the doctrine of qualified immunity insulates state actors from liability in close-call situations.  *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct).   But that affirmative defense protects government actors performing discretionary functions from liability for civil damages only when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs

-19-

of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (quoting *Russo v. City of Cincinnati*, 953 F.2d 1036, 1042 (6th Cir. 1992)); *see also Saucier*, 533 U.S. at 202 (describing the Court's inquiry as "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"); *cf. Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (noting that the right must be sufficiently particularized to allow a reasonable official to understand that he is violating the right). However, the Supreme Court has clarified that neither a decision of the Court nor an extreme level of factual specificity is necessary in every instance to give fair warning. *See United States v. Lanier*, 520 U.S. 259, 268 (1997). The Supreme Court has observed that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "The fact that the law may have been unclear, or even hotly disputed, at the margins does not afford state actors immunity from suit where their actions violate the heartland of the constitutional guarantee, as that guarantee was understood at the time of the violation." *Stemler v. City of Florence*, 126 F.3d 856, 867 (6th Cir. 1997).

Moreover, at the summary judgment stage, a defendant asserting qualified immunity must be "prepared to overlook any factual dispute and to concede an interpretation of the facts in the light most favorable to the plaintiff's case." *Humphrey v. Mabry*, 482 F.3d 840, 845 (6th Cir. 2007) (quoting *Berryman v. Rieger*, 150 F.3d 561, 562 (6th Cir. 1998)). "[W]here the legal question of

-20-

qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004).  In other words, "the nonmoving party is given the benefit of all relevant inferences at the summary judgment stage, and if a genuine dispute exists concerning predicate facts material to the qualified immunity issue, the defendant is not entitled to summary judgment on that ground." *Smithson v. Aldrich*, 235 F.3d 1058, 1061 (8th Cir. 2000) (internal quotation omitted).

The defendants are not entitled to qualified immunity, because any reasonable official in their positions would have known on May 6, 2014 that their deliberate and disturbing abuse of authority as established by the plaintiff's version of the evidence violated Davis's clearly established due process rights.  It is well established in the Sixth Circuit that where a government official unlawfully deprives a mother of the custody of her child without any justification, that conduct is actionable as a violation of substantive due process.  *Vinson v. Campbell Cnty. Fiscal Court*, 820 F.2d 194, 201 (6th Cir. 1987) ("Ms. Hornsby's alleged unlawful deprivation of plaintiff's liberty interest in the custody of her children was, in our view, an egregious abuse of governmental power sufficient to state a substantive due process violation.").  "Clearly, plaintiff had a 'fundamental liberty interest' in the care, custody and management of her children." *Id.* at 200 (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)).  "Plaintiff's interest in the physical custody of her children could not be terminated without compliance with the requirements of due process." *Id.* at 200-01 (citing *Polovchak v. Meese*, 774 F.2d 731, 735-36 (7th Cir. 1985); *Doe v. Staples*, 706 F.2d 985, 990 (6th Cir. 1983)).  The record evidence suggests that the defendants lied, coached a child to make false allegations of abuse, summarily denied Davis the lawful custody of her child, and afforded no meaningful consideration to her rendition of the circumstances, despite the fact that there was no

-21-

evidence that any abuse had occurred, and despite Kendrick's admissions that she thought the abuse allegations were false. Any reasonable official in the defendants' positions would have recognized that conduct as a clear and plain denial of Davis's substantive and procedural due process rights.

III.

Fact questions prevent judgment for the defendants as a matter of law on the merits of the plaintiff's claims and the defense of qualified immunity. The case, therefore, will proceed to trial. The case management order, as amended, scheduled a final pretrial conference for November 9, 2015, which would require the parties to submit a proposed joint final pretrial order to chambers by November 2, 2015. Because this motion was decided within a week of the due date of the proposed final pretrial order, the Court will extend the time for its submission to **November 4, 2015**. *See* E.D. Mich. LR 16.1(f). The final pretrial conference and trial dates will remain the same.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment [dkt. #26] is **DENIED**.

It is further **ORDERED** that the date for submission of the proposed joint final pretrial order to chambers is **EXTENDED** to **November 4, 2015**. The final pretrial conference and trial dates will remain unchanged.

s/David M. Lawson
DAVID M. LAWSON
Dated:   October 27, 2015           United States District Judge

-22-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on October 27, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI